We have one case on the call this morning, In Re Liquidation of Lumbermens. You'll have 15 minutes for the epilogue, 15 minutes for the epile, 5 minutes for the rebuttal. Before we call the case, who filed the motion to cite additional authority? The motion to file additional authority is not an excuse to write a supplemental brief. And that's exactly what you did. And Harvey, we also have a question. Why did you wait until 48 hours before the order to file the motion? You could stand up and talk. The second case that we cited on there had recently come down. It came down in February. Both of them came down in February. Your Honor, respectfully, the second one came down on April 23rd, but we weren't sure that we were going to make the decision to... When you file a motion to cite additional authority, you file a motion that says, I'd like to file additional authority, it's in support of our position that appears in such and such a place on a brief. In your case, it would have been subsection E of your reply brief. And here are the names of the two cases. You don't write a new brief. It's unfair. Where would your opponent ever have an opportunity to respond to you when you filed that motion within 48 hours prior to Wallace? It's like checking and raising in a card game. It doesn't work. Yes. Call the case. Case number 17-0996, Ingram's Prediction of Vulnerable Mutual Casualty Company. Counsel? Good morning. My name is James Oakley, and I'm here on behalf of Jennifer Hammer, the Director of Insurance for the State of Illinois, as statutory liquidator of vulnerables. May it please the Court. Two different statutes that have different language and apply under different circumstances can't mean the same thing, as CBA urges this Court to find in this case. Second, courts that apply statutory language, courts must apply statutory language as written and can't add unstated limitations, conditions, or exceptions, and the Supreme Court has recently told us that in Monago. Third, the California legislature could have incorporated the limitations that CBA has urged in this case. They could have limited the all expenses language by reference to Section 11698.02, but they didn't. I'd like to give a couple of other points before we get to that issue. You suggest in your brief that the special accounts, and specifically the special account held in California, is part of the general assets of lumbermen. What do you rely on to support that? Your Honor, we rely on the Illinois Supreme Court decision in Washburn. In that case, the Court found that the general assets of the estate, of that estate, included encumbered assets. In that case, it was assets upon which a federal court would impose a constructive trust, and the Court analyzed the statute and said that the statutory scheme in Article 13 of the Illinois Insurance Code deals with all sorts of assets, including... Yeah, that's true. And you drew your definition in your brief from Section 187.6, which appears in Article 13. But this case involves the liquidation of an insurance company that has assets in multiple states. So it's governed by Article 13.5. And 13.5, they're reciprocal states, are they not? You concede that? Illinois and California are reciprocal states for the purpose of the Uniform Act? Well, if they're reciprocal states, then Article 13.5 governs, and Article 13.5 has its own definition of assets. And it specifically exempts special deposits. It says the domiciliary receiver is entitled to recover the assets except as to the special deposits of the insurance in reciprocal states. That's Section 221.2. So why would you say they're part of the general assets if they're specifically exempted by statute? Well, Your Honor, Article 13.5 deals with the circumstance where you have ancillary liquidation proceedings set up in multiple states. We don't have that here. We're dealing with one liquidation proceeding in Illinois that's governed by Article 13. There is a special deposit that was funded by Lumbermans, and it's listed time and time again in the schedule of assets that Lumbermans filed with the liquidation court that everyone has received notice of, including SIGA. Well, didn't the Director of Insurance, Commissioner of Insurance of the State of California, direct in an order that all the assets of the special funds in California were to be turned over to the California Insurance Guarantee Association and that they're authorized to pay expenses from the special fund, which are related in the statements of claims, and they're to pay the claims? So where did you get the idea that if that was under the control of the Director of Insurance of the State of Illinois? Well, Your Honor, it's not currently under the control of the Director of Insurance, but it is an estate asset, and so the deposit was transferred to SIGA upon entry of the liquidation order as set forth in the California Code, and SIGA is charged with paying claims and all expenses related to the payment of claims as set forth in Section 11698.3b. That's absolutely true, but that doesn't mean that this asset is not an asset of the estate. In fact, the statutory section that I just referenced in Section D provides that the remainder of it would be sent back to the liquidator. The remainder of the deposit would be sent back to the liquidator after payment of claims. Well, not only payment of claims, payment of expenses. Absolutely. Certain expenses, and whatever's left over, which according to the California people will be less than nothing, goes back to be paid over to the director and become part of the general estate. It occurs to me that the definition of what's in the general assets is the one in 13 1⁄2, not the one in 13. This is a reciprocal state circumstance, and that was the purpose for 13 1⁄2. Well, as I said, Judge, 13 1⁄2 deals with ancillary proceedings, which we don't have here, and the definition, as the Washburn Court found, is limited solely to proceedings under 13 1⁄2, and applying it, as the Washburn Court found, to proceedings under Article 13 would not make sense as what that court said because of the statutory priority scheme, which includes distribution of secured assets. Okay, go ahead. I mean, we're fighting over what Section 11698.3b means when it says that the California Insurance Guarantee Association should use proceeds of the deposit, quote, for the payment of compensable workers' compensation claims, and then goes on to say, and all expenses related thereto. Now, you want to seize on related, and your opponent is going to seize on thereto. So why do you ignore related thereto? We don't ignore that, Your Honor. The expenses we're talking about here, and this comes from the— They're overhead. We know what the expenses are. They're overhead. Right, but the expenses are calculated, and they look at the internal people, and this is in Mr. Kennedy's affidavit, the people that work for Segal keep timesheets, and they keep track of how much time they spend working on lumberman's claims, and then they use that figure to come up with a ratio of the internal expenses that Segal has to figure out how much time did their people spend on lumberman's claims. That's their affidavit. That's what they've said. And so what we're saying is the time that people spend at Segal internally working on these claims, paying claims, dealing with claims— Your position is that they got all the administrative expenses out of that special fund, isn't it? They have to pay all expenses related to the payment of workers' compensation claims. You don't want them—you will pay their rent, and you're going to pay their light bill, and you're going to pay all the rest of the overhead? No, Your Honor. Those expenses, the light bill and the rent, it's just a portion of those expenses that they've submitted as a claim that are based on that ratio of the time spent. So we— Go on. So we—what we're saying is that those expenses, because the people working on the lumberman's claims have to have an office to sit in as they sit there and work on these claims, those expenses are related to payment of these claims. Mr. Oakley, in the normal course of business, is there another source for that funding other than the source that you wish it to be drawn from? To pay the light bill and the rent and all those other kinds of things. I'm not sure I understand the question, Your Honor. What you're arguing is that pursuant to 11698.3b, all right, that some of the deposit has to be split off and used to cover CEDA's overhead, right? Okay. And the other side is saying something to the contrary, all right? So that opens the question of, if they're right, where does the rent and the light bill and those other things get funded from? Is there some other source of income? Yeah. Well, so CEDA is funded by its members, and its members are insurance companies that write insurance policies. So they pay a membership fee of some sort or an assessment? Exactly. CEDA writes in their brief, they could assess—they would have to assess their members to make these payments. All right. And then back to the statute that we're talking about here. It's just as often noted, you know, you've got the words, and all expenses related thereto. That's what this case is about. Yes, sir. The last word is thereto. Thereto is a reflexive word. It necessarily, by its very nature, refers back to something. It points to something. In the same sentence, the only other place where it looks like it should be pointing is the payment of the claims, the workers' comp claims. You think it should be pointing somewhere else. No, listen, I'm just reading your argument. No, you're reading my argument correctly then. Okay. But it's a matter of the definition of how broadly we interpret expenses. Well, and what's related to the payment of workers' compensation claims. I mean, we looked at the cases. Related to is broad. You know, for example, the California case in Chawana Key talks about on being just an impact on school facilities as a direct impact. Statutes amended to go to related to, and the court says, well, it's not just a direct impact. It includes direct or indirect impacts, things like traffic surrounding the schools, other things. And so related to is a broad term. Supreme Court said the same thing in the Morales v. Trans World Airlines case when we talk about the preemptive effect of the Airline Deregulation Act and ERISA related to those broadly reported. What do you think is encompassed by the phrase general administrative expenses? What does that include? Does that include rent? Power? That would include salaries? That's correct, Your Honor. I would point out that that phrase doesn't appear in the statute. It appears in 2051A, which is the priority statute, and it specifically directs that the assets of an installed insurance company shall be distributed, A, to cost and expenses of administration, including, and then subsection I, reasonable expenses of the guarantee fund in any similar organization in any other state, including overhead salaries and other general administrative expenses. Now, if your theory were correct, you want to create a subclass within A to say that any guarantee fund that has assets in their possession must first exhaust those assets before they are entitled to partake in the payment of claims under A of 2051, and your opponent will say, this is pretty clear on its face, you've got to pay all the administrative expenses. Well, Your Honor, what actually our opponent has said is that they cannot, the California statute prohibits CEGA from paying these expenses. I know what they're saying, and the administrative order specifically says what they're supposed to pay, and it's not administrative expenses. It's expenses directly related to the claims. That, Your Honor, I respectfully must disagree with you. The administrative order does not say that. It does not say directly. It says that they are to pay all expenses as set forth in Section 11698.3B. Now, CEGA and the- I think I'll read it to you. CEGA, that they're only authorized to pay expenses from specific deposits which are directly related to the payment of a compensable claim. That's their argument. That's their argument. Yes, Your Honor. That's their argument. But, see, that argument rests on adding this word directly, and that's what we find with a lot of their arguments. We have to add language that you won't see in the statute to come up with the result they want, and Monago tells us we can't add those kinds of words and limitations. Well, unless, of course, we follow what Justice DeLorte said, that the thereto refers specifically to expenses directly related to claims. It's the payment of compensable workers' compensation claims, expenses related thereto, related to the payment of the claim. Overhead is not related to the payment of the claim. It's overhead. Respectfully, Your Honor- You've got to resist whether there's one claim or there's 100 claims, aren't there? They can have rent. Well, remember, this is a portion of the rent that's proportional to the people working on the one of the claims. We understand that, but they're working on other things, too, aren't they? No, this is only the hours they spend on these claims. They work on other claims other than lumberman's claims, not during the same hours. Different hours? Yes. Okay, so you're not paying 100% of the salary. You're only paying that portion of the salary that they claim is working on lumberman's claim. But it's not related to a claim. It's the claims plural. So it becomes overhead. There are expenses that are directly related to a claim. You have an attorney representing the fund on A against B, a workers' compensation claim, whatever it is. That attorney's expense is directly related to that claim. But compensable claims is the whole job that they have to do, and the expenses related to those claims is what they're contending that they contend to. The distribution scheme, though, that I asked you about in 205 seems pretty clear. You've got to pay the general administrative expenses incurred by a guarantee fund. You are correct that that portion of Article 13 authorizes payment of administrative expenses for the guarantee fund. Well, it not only authorizes it, it sets it off as primary priority. First priority, yes. Absolutely first priority. All has to be discharged before the next person gets it back. Right. But as to the all expenses related thereto, what we're saying is, yes, they can submit the claim as an administrative claim here. When the deposit has been used to pay these claims, they're saying they can't use it. And to get to your point on the all expenses related thereto, what we're saying is these claims, these loaner's claims, can't magically pay themselves, the workers' compensation claims. There are people that have to work on them. When you talk about related to payment of claims, the expenses of having those people pay the claims are related to the payment of claims. That's what we're saying. And so, now, all expenses, I do want to point out, all expenses, I mean, they've said in their affidavit that they don't have two types of expenses. They have the allocated claims expenses and they have these other expenses. And so they're saying all they can pay are allocated claims expenses. And we're saying all expenses related to the payment of claims is broader than that, includes both expenses, not just one. Let me ask you a question. You said that the claims adjusters or whoever the people are, they keep time records so that they are able to accurately identify the amount of time that they're spending on the claims that are in dispute here. How do you do that with respect to the other things other than their time, such as, you know, whatever it takes to keep a building functioning? If you're in a building someplace, there's light, there's, you know, electricity and power. How do you do the allocation? Because it seems like there's a lot of parsing going on, and that's okay if it's accurate. But how would you do the allocation for the other things other than the time that these adjusters are spending? How would you do that? Your Honor, they've done it. So CEA has broken out those expenses. And the way they do it is they take the time that these individuals spend and then they aggregate, add up all the time that the individuals have spent on one particular estate and then divide that by the total amount of time spent on all estates to come up with a ratio and then use that ratio and apply it to the other expenses, lights, rent, et cetera, that you're speaking of. So that ratio is applied to limit it. And this information that I'm providing comes from Mr. Kennedy's affidavit. He's the finance director from CEA. That's how they said that they've done it. Okay. Let us hear from your opponent, and we'll give you some time out as well. Thank you very much, Your Honor. Good morning. May it please the Court. I represent CEA, the FLE, California Insurance Guarantee Fund Association. I'm sorry, I will refer to it as CEA. And by the way, the two E's at the end of guarantee, that's not a typo. That's the way it's spelled in the statute. What is your name? I'm sorry. Tell us who you are. Oh, I'm sorry. My name is Roe Snyder-Watt-Lord. CEA, and by the way, I'm sure that we all understand this, but these guarantee funds exist in most states. Illinois has one. All states have them. And multiple ones were triggered by the Lumberman's liquidation. The issue here today is more than, I know we focused in the opening discussion here about statutory construction, and that's certainly important. What does statute mean? But it's really more than that. Specifically, it includes an issue about the integrity, if you will, of our state-based insurance insolvency regulation system and what are the appropriate limits for one regulator in the capacity as a liquidator to try to influence the regulation of insurance, particularly the insolvency safety net. Counsel, the theories behind these states and what the purposes are are all interesting, but we're dealing with the interpretation of two sets of statutes. So could we focus in on the interpretation of the statutes and why you think they should be interpreted in your direction? I won't go directly there. Your Honor, Justice Hoffman, you said earlier that what we're concerned about is what does the specific language in 11688.3b of the California Workers' Compensation Special Deposit mean? And the specific language that we've all focused on in these briefs is the language, what compensable workers' compensation claims and all expenses related there to. Now, the liquidator says that the plain meaning of that language encompasses all sorts of things and that the court can't look beyond the particular words, those four little words in the statute, to figure out what they mean. From your questions, I don't think you're accepting that. And that's right if you look at the Lindgren case cited in our briefs. It's clear that the court, by the way, everyone agrees that California statutory construction rules apply here. And that case makes it very clear that you can look at other sections of the statute, history, purpose, et cetera, the context, to figure out what this word means. You asked earlier, what are these administrative expenses versus the other expenses that we consider to be expenses related to claims? My opponent correctly pointed out that Mr. Kennedy, who's the CFO for CEGA, has attached declarations to the trial court briefs. He outlines specifically what the administrative expenses are. Let's talk about those for one second. It's actually on page two of his declaration in the trial court brief. And he says that these things, and this is illustrative, are things like employer-contractor expenses, general legal and non-defense fees, professional expenses like auditors, travel and media expenses, insurance, office rent, utilities, investment management fees, and general office expenses. That's specifically out of his declaration. Traditionally in the insurance industry, when we talk about expenses related to claims, we're talking about expenses that are variable by claims or directly related to claims. In fact, there is, well known in the insurance industry, it's supported, the background on it is all in our briefs, a concept called allocated loss adjustment expenses. And that's what people in the insurance industry think of when they think about expenses related to claims. Would that include such things as defense costs of a particular individual's worker's company against a particular employer? No, precisely. In general, what these expenses coincide with, and this is important, what these expenses coincide with are policy obligations that one government would have had in the state of California to either pay worker's comp claims or to defend employers in the course of worker's compensation proceedings. That's what the policy is under attention to. There's two ways of looking at something. If you're talking about clerical salaries, clerical salaries are not related to a claim. They're related to claims, plural. So they're general administrative expenses. Rent is not a claim. It's claims, plural. But when you have a claims adjustment and he works for two hours on A against B, is that a general administrative expense or is that an allocated expense? The answer to that question depends on a whole system that's agreed upon. It's described in our briefs and in the trial court briefs. There's a whole system that all of the insurance commissioners and the guarantee funds have agreed upon called the uniform data system. And certain expenses are reported on a record. I think it's called the C record. This is described in Mr. Kennedy's declarations. And those are claims expenses. And the other expenses are considered administrative overhead expenses. But that's not answering my question. Correct. I can understand your argument. Clerical expenses, rent, utilities, accounting services. These are general administrative expenses. They are not allocated to any specific claim. But if you have a claims adjuster that works for one hour on A against B, works two hours on C against D, then how do you make the argument that his pay for that hour or those two hours are general administrative expenses as opposed to being allocated expenses because they relate to a specific claim? I don't particularly care what your insurance adjusters decide their accounting is going to be. I want to know what this is in relation to these definitions. I understand. Andrew, if it is an in-house claims adjuster, that time is allocated to a specific, I believe it's allocated to a specific claim. So you don't seek reimbursement for that from the director. Does the claims adjuster, actually I answered Justice Hoffman's question first. Not as an administrative expense. No, I understand. So you only seek reimbursement for the secretaries, for the rent, for the light. The general administrative expenses that are not directly related to the collection. That's my general understanding. I know, for example, if the California Insurance Guarantee Association hires a claim adjuster, a TPA, that is associated with a claim, and that is a claims expense. There's nuances to this, but there is an agreement, an overall agreement, among all of the receivers and liquidators that classify these expenses. The general nature of these administrative expenses are the ones we talked about. Now, the ones in Mr. Kennedy's declaration. The important thing to understand here, and your questions to my opponent, to the Liquidators Council, were spot on. When we talk about expenses related to workers' compensation claims, that is a different relationship than all expenses related to the estate. So you're asking about the specific provision in 11698. But what about your opponent's point, and he repeated this several times, that they're able to specifically identify the amount of time, whether it's adjuster time or percentage of the overhead light bill and so on. They're able to specifically identify how much of that is spent on lumberman's claims. Would that make any difference to you? That's actually, it's not spent on lumberman's claims. It's allocated extrinsically to the lumberman's estate. If you look at the diagram on page 35 of our brief, you will see that there are specific classifications of expenses that relate directly to lumberman's workers' compensation claims. What the liquidators completely ignored is that there are other kinds of claims in the lumberman's estate. There are auto claims. There are homeowner claims. There's records showing that lumberman's wrote other kinds of business in the state of California. If the California legislature intended to have all of the administrative expenses charged to the estate taken out of the deposit, they would have used different language. We agree with you that they must pay the general administrative expenses of the California Insurance Guarantee Fund and the liquidation of lumberman's workers' compensation claims. The general administrative expenses. You don't dispute the fact that if you submit a bill of expenses to them, they can contest whether it is or is not a general administrative expense to you. They most certainly can, and they most certainly do that. On a bill-by-bill basis. What we're here to talk about is whether the director has to pay the general administrative expenses as opposed to the allocated expenses, or whether lumberman's can be forced to exhaust all of the assets within the special fund before they can submit a bill even for general administrative expenses to the director. The director wants to create, as I see it, a subclass within 2051A in the distribution scheme saying that a guarantee fund that has no special deposit gets all of its expenses paid by the director, but if you have a special deposit, you must exhaust it before we'll pay any bills. That's right. And as Your Honor undoubtedly knows, subclasses are prohibited by case law with respect to that. The liquidator cannot create these subclasses. I would also point out, Your Honor, that in the Illinois Guarantee Fund Act, in Section 545C, there is an explicit mandate in which the provision says the liquidator shall reimburse the administrative expenses of the Illinois Insurance Guarantee Fund and similar organizations in other states. There's a non-relevant exception to that, but it doesn't apply. No one suggests that's relevant here. So there is a mandate to pay these expenses. That statute was passed long after the statutes that created these deposits were enacted. And let's not forget, if we could, that if the liquidator is wrong, SIGA is put in a very, very awkward position. There's a big, big but here with respect to the exhaustion requirement that the liquidator is simply placed in a motion to allow claims in the trial court without citing any authority, really. It's just a paragraph or two, we file an objection. So the problem is that the California Department of Insurance, which filed an amicus brief, which the General Counsel submitted a declaration in the trial court, saying that A, the order that Your Honor referred to earlier, Justice Hoffman, says what SIGA says it does, and the amicus brief says the same thing. And what we respectfully submit is this, that under California law, if you look at the phrase, expenses related to workers' compensation claims, you can boil it down to that. That's a reformulation of 11688.3. That the California director is entitled, since this is a regulatory statute in California, to mitigate the impact of insolvency in California, the California director is entitled to deference with respect to what that means. And really, what we're trying to decide here, I think, in framing this issue is The California director is entitled to deference only if the statute is ambiguous. If the statute is unambiguous, he gets no deference at all. It is what it is. That's a legal question. It is a legal question. Whether the statute is ambiguous or not is sort of an 800-pound gorilla, but let me say this. You have a three-year, two parties suggesting that the statute means very different things. Just because two parties suggest different meanings doesn't mean that they're both reasonable meanings in light of the language used. It's for us to decide, number one, whether it's ambiguous or not. And if it is not ambiguous, it's for us to determine what its meaning is as a matter of law. And without regard to what the California commissioner of insurance says, if, on the other hand, it's ambiguous, then in that particular case, some deference might be owed under both California law and Illinois law. Your Honor, that's right, and I'm certainly not trying to disturb your decision about whether this is ambiguous or not. I'm simply observing that you've got a liquidator and the California Department and CIA on respective sides of an argument about what this statute means. And let me say this. The word relationship. This case turns a lot on the word relationship. And relationship, let's think about this. You mean the word related? Related to. Related to. Thank you, Your Honor. That's actually correct. The word related is, by its very nature, contextual. Let's think about why that is. Even in a plain meaning, forget about the fact that claims-related expenses of insurance normally alludes to ARE. In normal, everyday politics, if we say George is related to Linda, it has something to do with George. It has to do with the nature of George, not something else. If we say, here's a better example, if we say driving-related expenses, what that means is extremely dependent on context. For example, it normally means, when we talk about it, fuel, gas, insurance for the car. Things that are directly related to driving. If, however, you're a sociologist or a macroeconomist, and you want to talk about the social impact of driving-related expenses, all of a sudden, it's the cost of congestion, it's the cost of building expressways, it's the carbon load on the atmosphere. It could mean a variety of different things. What I respectfully urge you to do is reflect on, what does related mean in this context? If it meant, if the California legislature intended what the liquidator says they intend, they would have expressly mentioned administrative expenses, which they do. They did. They do. In the SEIA Act, which is the first statute cited, I believe, in our appendix, the words appear. The words never appear. Administrative expenses never appears in the California Workers' Compensation Special Deposit Article at all. The only concept that relates to or addresses this question of related is out there loss adjustment expenses. Expenses of adjusting a claim. So that is what we believe is the absolute best interpretation and proper interpretation. Is it your position that whichever way we go, the payment that is owed to California Insurance Guarantee Association by the Director of Insurance of the State of Illinois is owed pursuant to Section 205-1A of the Illinois Insurance Code? Correct. Okay. Yes. That is interpreted if you, just to elaborate on that slightly. If you, it is connected to, by statute, the provision in Section 545, which is part of the Article 34 of the Guarantee Fund Act. Okay. Yes. Thank you. Okay. Do you concede that whatever money is owed by the Director of Insurance of the State of Illinois for expenses to the California Insurance Guarantee Association is owed by reason of Section 205-1A of the Illinois Insurance Code? Yes, that they can be reimbursed for administrative expenses pursuant to that provision. Yes, Your Honor. I want to make a couple of points. So I suppose my question is, if the Illinois Legislature wanted to carve out an exception for a guarantee fund that has funds available to pay its own expenses, why don't they put it in? Because what they said is you've got to pay the reasonable expenses, any similar organization to your claim, including, and I'm going to quote, overhead, salaries, and other similar general administrative expenses allocable. So what's confusing about that? Well, Your Honor, it says that those are claims that can be submitted to the estate, but the liquidator has substantial discretion to deal with this liquidation as she sees fit. But she doesn't have the discretion to deviate from the priority in this statute. Not discretion to deviate from priority, absolutely not. She doesn't have the discretion to rewrite it. No, I agree. What I'm saying, though, is if, I'm sorry, Sika says they can't pay these expenses out of deposit, they've got to come here separately. What that means is they're going to come in and take $41 million that would otherwise flow down the priority scheme you're talking about. What I'm saying to you is you distribute this money in accordance with your statute in Illinois. You pay us our overhead, our salaries, and our other general administrative expenses. And it doesn't say salaries, overhead, and other general administrative expenses, only as they exceed the availability to obtain reimbursement from our own special fund. Yeah, but what I'm saying, Your Honor, is that the liquidator is charged with having a ratable distribution to all of the folks in the priority scheme. And they look to California. They see an asset of the estate, which is the deposit. They see a statute that says Sika can pay its expenses out of that statute. And doing so will result in a ratable distribution for all policyholders. Except for one problem that you don't seem to answer. If there are states that have no guarantee fund and there are states that do have a guarantee fund, how can you make the argument that the director isn't creating a different class in the priority scheme? Because the state that has no special fund at all gets 100% of its overhead, salaries, and other administrative expenses paid by the director. Is that correct? They have no money to pay for it. She pays it all. But in a state that has a special fund, she doesn't pay it all. She only pays it after they've exhausted it. Right, because that fund is Lumberman's assets. It was money set aside by Lumberman for this purpose. To pay all expenses related to the payment of claims, which includes this. That's why the money's there. See, the problem that we have is there are two different statutes in California. And that's something that's overlooked by Sika. There's one, 11698.02, that deals with the expenses that can be paid when the commissioner holds the deposit. Not this situation. And then there's 11698.3b that deals with our situation when Sika has the deposit. And what they're saying is, and what the trial court said is, we've got to take the language from 11698.02 that says claims adjustment expenses and replace the language in 11698.3b with it. And there's no basis for doing that. There's no case that says we should do that. They haven't cited one. Lumberman, which he cites, actually says the opposite. They refuse the invitation to do that. And we know that in California, both the Supreme Courts in Monago and in Diamond Systems in California, have said we can't do that. And they've said it over and over again, because we presume legislatures that set up different rules that apply under different circumstances and employ different language do it for a reason. We don't presume the opposite, as Sika wants us to do. They want us to say, well, all expenses really means allocated claims expenses. But it doesn't. It's different language, and the legislature did it for a reason. So we can't read the statute such that we just read this all expenses language out of it. I want you to answer Justice Hoffman's question, because I was waiting to hear the answer, and I'm still waiting. Okay. What about those states that don't have a fund? I mean, this goes to the question of creating two separate classes. What about those states where there is no fund so that all of the expenses would be paid? I mean, what about that? I apologize, Your Honor. I thought I answered those. You may have answered something, but I didn't think it related to the questions. That's why I'm asking it again. Absolutely, Your Honor. So those states without a deposit can submit their claim for administrative expenses and get paid. Well, I know they can. But if we accept your theory, aren't we creating two categories of payees, so to speak? We know one category with states that have such a fund and another category with states that do not. Isn't that what we're doing? And aren't we prohibited from doing that? No, Your Honor. Well, yes, you are prohibited from doing that, but no, that's not what we're doing because CEQA can submit its claim as an administrative expense claim if they can no longer pay the expenses out of the deposit. But that's the big if that isn't in the statute. The statute says pay the administrative expenses, pay their overhead, pay their salaries, pay their utilities. It doesn't say pay them if they can't pay them. It says pay them. And we're paying them from the special deposit that came from one of those assets, which are assets of the estate. They're absolutely being paid. That's the point. They're being promptly paid because CEQA gets reimbursed out of that. Can the Director of Insurance of the State of Illinois tell CEQA how to spend the money within the special deposit before the claims in California have been discharged? Well, it's the statute that says it. Well, no. The statute doesn't say the Director of Insurance of the State of Illinois can direct the guarantee funds in other states how to expend their funds. No, no. What I'm saying is that 1168.3b says how CEQA, precisely how CEQA can use the funds. Assuming we interpret related thereto as you want us to interpret as opposed to the way your opponent wants us to interpret. Absolutely, Your Honor. Okay. Absolutely, Your Honor. And I'll just make a point regarding all of the different rules of construction like deference, last antecedent rule, all of this stuff. CEQA wants to ask this court to employ this complex analysis. They have something like an eight-part analysis in their brief. And what we're saying, and they want to take this drastic step of substituting one statutory provision for another. And what we're saying is we'd like the court to just interpret the language, the all expenses related to their two language, pursuant to its plain language, as we've laid out, and thereby find that it includes these expenses that have been submitted in reverse the trial court's order. Counsel, thank you very much. Interesting. The case will be taken under revised court's adjournment. Thank you.